Harry L. Miller v. Commissioner. Estate of Mary M. Miller, Deceased, Harry L. Miller, Executor v. Commissioner.
Miller v. Commissioner
Docket Nos. 23192, 23193.
United States Tax Court
1951 Tax Ct. Memo LEXIS 303; 10 T.C.M. (CCH) 210; T.C.M. (RIA) 51064; March 9, 1951
*303 R. B. Hooper, Esq., and A. R. Kehoe, Esq., for the petitioners. Douglas L. Barnes, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in income tax of $5,130.52 and a 5 per cent negligence penalty of $256.53 for the calendar year 1945 against each petitioner. By amended answer respondent seeks to have the deficiency in each proceeding increased to $6,498.06 and the negligence penalty to $324.90. The issues are: (1) Does that portion of the proceeds received by petitioners from the sale of an apple orchard allocable to a growing crop of apples constitute ordinary income? (2) If so, what portion is so allocable? (3) Did respondent properly compute in his amended answer the amount of net capital gain realized by petitioners from the above sale? (4) Are petitioners liable for negligence penalties? The proceedings were consolidated for hearing. A portion of the facts were stipulated and are so found. Findings of Fact Petitioner Harry L. Miller is an individual and a resident of Wenatchee, Washington, and is the duly appointed, qualified and acting executor of the estate of Mary M. *304 Miller, decased, under order of the Superior Court of the State of Washington for Chelan County. Mary M. Miller died December 3, 1949. She was during the year 1945 and prior thereto the wife of petitioner Harry L. Miller. Harry L. Miller (hereinafter sometimes referred to as petitioner), and his wife filed timely income tax returns on a community property basis for the calendar year 1945 with the collector of internal revenue for the district of Washington at Tacoma. The apple orchard which was sold by petitioner in June, 1945, was purchased in 1941 at a cost of $15,000. This purchase price was allocated on the books and records of petitioner as follows: land $1,500; trees $8,500; packing shed $3,500; other equipment $1,500. The orchard was situated at Brewster, Washington, and consisted of 100 acres containing apple trees approximately 30 years old, and 4 acres containing buildings. It was an abandoned orchard at the time of purchase in 1941. Thereafter petitioner borrowed substantial sums of money from the Regional Agricultural Credit Corporation and installed considerable additional facilities and equipment. By 1945 the orchard was fully equipped as an operating unit, and included *305 various types of mechanical equipment, a spray house and spraying system, and an irrigation system by means of which water was pumped from the Columbia River and distributed over the orchard, a three-story warehouse with complete cold storage facilities, a packing shed and plant with a capacity of approximately 40 carloads of apples, eight two-story dwelling houses including one occupied by petitioner, about 20 employees' cabins, and a mess hall. Petitioners' total original cost for the complete ranch, equipment and all improvements and additions was $45,151. In June 1945, the reserve for depreciation on the assets sold was $10,905.05 and the depreciated cost $34,245.95. Petitioner has been engaged in businesses connected with fruit orchards, either as an orchardist himself or with the Department of Agriculture or in apple shipping since 1910. Petitioners' operation of the orchard from 1941 to 1945 constituted their sole occupation and source of income. They experienced several very profitable years of operation on the orchard subsequent to its acquisition in 1941. During the year 1943 total receipts from fruit sales were $175,947.24 and they reported a net profit of $95,869.99. *306 During the year 1944 total receipts from fruit sold were in the amount of $222,381.23 and they reported a net profit of $80,243.78. By reason of the cold storage facilities installed on petitioners' ranch they were able to carry over the winter and inventory for tax purposes up to 25,000 boxes of packed apples which were ordinarily sold early in the spring of the following year. Accordingly, in the spring of 1945 petitioners received from the sale of fruit which was picked in the fall of 1944, the amount of $92,581.13. There was no apple inventory on hand in June, 1945. The production in 1942 was 62,539 boxes; in 1943, 82,000 boxes; in 1944, 89,000 boxes. In 1945, after the orchard was sold by petitioners, the production was 47,000 boxes. Petitioner maintained for tax purposes an inventory of fruit on hand at the close of the year, although he did not inventory miscellaneous supplies, box shook and other materials which were purchased for use in the packing season. Accordingly, in preparing community tax returns for the year 1945, petitioner deducted for the period January to June the following expenditures (in addition to depreciation and opening inventory) as a part of his cost *307 of fruit sold: Labor
$12,011.49
Supplies: Fertilizer
$ 1,675.27
Gas and oil
333.09
Spray Material
4,755.25
Nails
402.15
Boxes
14,247.70
PaperYJ657.17
Miscellaneous and Cook
House
2,006.84
24,077.47
Other Costs: Power
374.22
Bee Rental
700.00
1,074.22
Taxes, Real Estate
237.83
Insurance
787.61
Repairs
2,337.11
3,124.72
Total
$40,525.73
The amount of $14,247.70 reflected in the expenditures for "Boxes" represents the cost of the 63,000 box shook which were on hand on June 26, 1945, when the property was sold. Nails costing $402.15 and paper costing $657.17 were also on hand as of that date, since all packing and boxing was done in the fall of the year. Twenty tons of sodium nitrate fertilizer, which were on hand June 26, cost at least $900. The total cost of these supplies was $16,207.02. Having deducted all of the 1945 expenditures for box shook, fertilizer, paper and nails, petitioners had no tax basis for these supplies at the time of disposition of the orchard. Petitioner's wife had been actively engaged in the business of managing the orchard with petitioner prior to 1945, and in the winter of 1944-1945, for reasons *308 of his wife's health, petitioner decided to sell the orchard if he could get any price for it sufficient to provide for himself and his wife for the balance of their lives. Petitioner during the winter of 1944-1945 offered his orchard for sale as an entity for the sum of $115,000 without employing a real estate broker to sell it for him. At that time there was no crop on the land. Discussions were commenced between petitioner and the ultimate purchasers, on March 19, 1945, and a price of $90,000 was later agreed upon for the entire orchard property. The purchasers were Thomas F. Balmer, of Seattle, an attorney and vice president and western counsel of the Great Northern Railway, and I. F. Wade, a local orchardist. From the time of the initiation of negotiations between the parties to the sale and to a time just prior to final consummation of the sale on June 26, 1945, no discussions were had concerning allocation of the purchase price between land, equipment and the then growing crop. Before consummation of the sale, petitioner's attorney, D. A. Shiner of Wenatchee, Washington, drafted a document providing for sale of the property in its entirety for $90,000. However, Balmer insisted *309 on separate documents to transfer title to the realty and the personalty involved, and a separate conveyance of the crops as a seasonal item for the purpose of setting up his own books at a definite figure. Balmer asked petitioner if he had any objection to payment of the total purchase price by means of three separate checks and assumption of petitioners' indebtedness to the Regional Agricultural Credit Corporation. Petitioner stated he did not, so long as the total payment was $90,000. The final documents excuted in connection with the sale were prepared by Balmer personally onjune 26, the day the transaction was concluded, and consisted of the following: "A bill of sale conveying the crops upon petitioners' ranch and reciting a consideration therefor of $12,753.83 paid by the purchasers and the assumption by them of petitioners' debt in the amount of $27,771.90 to the Regional Agricultural Credit Corporation, a total of $40,525.73. "A warranty deed to the real estate included in the sale, reciting a consideration therefor of $30,000. "A bill of sale of the personal property, including the movable equipment used in operating the ranch and also including supplies consisting *310 of 63,000 box shook, 80 kegs of nails, estimated 250 bales of paper, and 20 tons of sodium nitrate fertilizer, and reciting a consideration therefor of $19,474.27." Balmer arrived at the figure of $40,525.73 as consideration for the crop from the list of expenses on the 1945 crop furnished by petitioner to Balmer and corresponding with the expenses of $40,525.73 deducted on petitioners' 1945 community returns as part of the cost of fruit sold. Included in such expenses were, in addition to labor, repairs, insurance, etc., supplies consisting of box shook, nails, paper, and sodium nitrate costing $16,207.02, as noted above. Petitioner did not inventory such supplies but charged them to expense when purchased. There was no discussion of this figure of $40,525.73 for the crops nor was any objection raised by anyone to that figure at the time of sale. Balmer and Shiner, petitioner's attorney, discussed the division of the remaining $49,474.27 between the real property and the personal property, and arrived at a division of $30,000 for the real property and $19,474.27 for the personal property. At the time of consummation of the sale, or prior thereto, petitioner was not advised of the *311 tax consequences either to himself or to the purchasers of the specific allocations of the purchase price which were made, and he took no part in the determination of these separate amounts. C. W. Franklin, certified public accountant, who prepared petitioners' returns for 1945, did not participate in the negotiations in connection with the sale and was unaware at the time the returns were filed that separate documents had been executed for the sale. The purchasers paid the purchase price for the property in the following manner: By check of Thomas Balmer in the sum of $24,737.14; by another check of Thomas Balmer in the amount of $12,753.83; by check of I. F. Wade in the sum of $24,737.13; by assumption of indebtedness to Regional Agricultural Credit Corporation for crop financing in the sum of $27,771.90. Petitioners' expenses on the sale were: Commission, $500; legal fees, $254.75. The growing crop of apples on petitioners' land at the time the sale thereof was consummated was immature and in the ordinary course of growth would not reach maturity prior to September 15. The apples were approximately one inch in diameter, smaller than the size of a black walnut, and at the time *312 of sale were subject to such hazards as "June drop", a normal condition under which an underterminable proportion of the apples would drop off the trees some time in June or early in July; insect damage; and weather conditions, such as summer hail storms and wind storms, capable of wiping out the crop in a matter of minutes. The depreciated basis of the equipment transferred by the bill of sale of personal property and the reasonable market value thereof as reflected in the 1945 tax return filed by petitioners and accepted by respondent was $21,733.92, computed as follows: Reserve for
Adjusted
Cost
Depreciation
Basis
General orchard equipment
$ 7,768.85
$3,379.11
$ 4,389.74
Orchard equipment additions
2,466.91
740.35
1,726.56
Cold storage equipment
7,844.65
1,568.65
6,276.00
Equipment
9,163.30
1,768.81
7,394.49
Tractor
1,567.69
156.76
1,410.93
Trailer
225.00
18.75
206.25
Brush rake
370.03
40.08
329.95
Totals
$29,406.43
$7,672.51
$21,733.92
In the sale of the assets listed in the bill of sale of personal property for $19,474.27, petitioners sustained a long-term capital loss on the sale of depreciable personal property *313 held more than six months, and received a short-term capital gain on the sale of the supplies acquired between January 1, 1945, and the date of sale, June 26, 1945, computed as follows: Total Receipts
$19,474.27
Allocable to depreciables
(21,733/37940)
11,155.37
Less: Adjusted basis
$21,733.92
Expense of sale-
allocated
93.55
21,827.47
Community long-term
capital loss
(10,672.10)
Allocable to supplies
(16,207/37,940)
8,318.90
Less: Basis
None
Expense of sale
allocated
$69.76
$69.76
Community short-term
capital gain
$ 8,249.14
The basis of the land and improvements conveyed by the warranty deed was $12,512.03, computed as follows: Basis for all assets sold
$34,245.95
Less: Basis for depreciable personal
property
21,733.92
Remaining basis, land and improve-
ments
$12,512.03
The portion of the selling price of the ranch, $90,000, allocable to the land and improvements was $46,207.02. Petitioners realized a community long-term capital gain in the year 1945 upon the sale of the land and improvements in the amount of $33,220.99, computed as follows: Selling price
$46,207.02
Less: Adjusted basis
$12,512.03
Abstract
$ 86.50
Allocable commission and legal fees
387.50
474.00
12,986.03
Long-term capital gain
$33,220.99
*314 The net capital gain properly includible in the taxable gross income of each petitioner for the year 1945 is in the amount of $9,761.80, computed as follows: Gross Gain
or Loss
Percentage
Includible
Net long-term gain and losses
$33,220.99
50%
$16,610.50
Depreciable personal property
(10,672.10)
50%
(5,336.05)
Net long-term gain
11,274.45
Net short-term gain
8,249.14
100%
8,249.14
Net gain
$19,523.59
1/2 Harry L. Miller
$ 9,761.80
1/2 Mary M. Miller
$ 9,761.80
The portion of the selling price of the ranch, $90,000, allocable to the growing crop was $24,318.71. Petitioners received ordinary community income of $24,114.77 for tax purposes in the year 1945 from such sale of growing crops, which was not included in their returns as filed. The income so received is computed as follows: Selling price
$24,318.71
Less: Allocable commission and legal
fees
203.94
Net community income from sale
$24,114.77
1/2 Harry L. Miller
$12,057.89
1/2 Mary M. Miller
$12,057.89
The failure of petitioners correctly to report their gain from the sale of the orchard upon their returns for 1945 was not due to negligence *315 or intentional disregard of rules and regulations. Opinion Petitioners reported as long-term capital gain the gain from the sale for $90,000 in 1945 of an apple orchard, which included land, improvements, depreciable personal property, supplies, and a growing crop of apples. However, following the recent decisions of this Court in (promulgated December 7, 1950), and (promulgated December 12, 1950), we sustain respondent's determination that the portion of the total sales price allocable to the crop constituted ordinary income to petitioners in 1945. A second issue arises as to the actual amounts allocable to the crop, the land, and the other assets sold. The facts show that the sale of the orchard for $90,000 was effected on June 26, 1945, by three separate instruments - a warranty deed to the land and improvements, reciting a consideration of $30,000 therefor, a bill of sale of the depreciable personal property and supplies, reciting a consideration of $19,474.27 therefor, and a bill of sale of the growing crop, reciting a consideration of $40,525.73 therefor. Respondent maintains that petitioners *316 are bound by these recitals of consideration and he made his allocations in accordance therewith, i.e., $30,000 to the land and improvements, $19,474.27 to the depreciable personal property and supplies, and $40,525.73 to the crop. Petitioners, however, contend that they are not bound by these recitals of consideration. They maintain, in the first place, that the consideration recited for the crop represents an overvaluation of it in proportion to the other assets transferred, and that the proper amount allocable to the crop is not more than one-half of $40,525.73. We agree with petitioners' contention that under the circumstances of this case they are not bound by the allocation made to the growing crop in the bill of sale. To be sure, this Court said in : "The fair market value of the * * * crop is pertinent only for the purpose of making an allocation of the sale price as between the land and the growing crop. There is no necessity for making any such allocation, however, if there was an actual purchase and sale of the * * * crop at a fixed price. * * *" But the language "an actual purchase and sale" means an ordinary arm's length transaction *317 between buyer and seller in which a price is mutually arrived at. Here, though the total selling price of $90,000 was the result of such an arm's length transaction, the same can not be said of the price of $40,525.73 for the crop. As the facts show, this price was arbitrarily and unilaterally fixed by Balmer, one of the purchasers. Petitioner and his attorney had, in fact, expected to convey all the assets by one instrument, reciting as consideration only the lump sum of $90,000. Upon Balmer's insistence on separate documents and separate checks, petitioner stated that he had no objection, so long as he received a total of $90,000. Petitioner was not advised of any of the tax consequences of the allocations of purchase price made, such as, for instance, that it was to the purchasers' advantage and to his disadvantage tax-wise that a high price be fixed for the crop and a low price for the land. We believe that these circumstances justify application to the allocations made in the documents of sale of the rule that "* * * the recitals of a written instrument as to the consideration received are not conclusive, and it is always competent to inquire into the consideration and show *318 by parol or other extrinsic evidence what the real consideration was." , citing many authorities. See . To determine the "real consideration" for each of the assets here sold is of necessity to determine its fair market value at the time of sale, June, 1945. It may be noted that at the time of sale of the orchard in June, 1945, the apple crop thereon was three months from maturity. The apples were small and subject to the usual June drop, to insect damage, and to weather conditions such as summer hail storms and wind storms capable of wiping out the crop in a matter of minutes. Though the orchard produced 89,000 boxes of apples in 1944 and petitioners reported a net profit thereon of $80,243.78 in that year, there was no assurance, at least not three months from maturity of the crop, that such a production would be repeated in 1945. (Actually, the 1945 production turned out to be about 47,000 boxes.) In these circumstances, a value of $40,525.73 for the crop three months before maturity seems *319 unduly high. The only justification offered by Balmer, one of the purchasers, for his picking that figure was that it represented the total of the expenses on the 1945 crop to the date of sale. However, the facts show that among these expenses were amounts totaling $16,207.02 expended for the purchase of certain supplies which were on hand on the date of sale. These supplies were listed with other assets in the bill of sale of the personal property, all of which was transferred for a recited consideration of $19,474.27. It was obviously fallacious to include the cost of these supplies in the consideration for the crop of $40,525.73 and at the same time to include them in the list of assets transferred for an additional consideration of $19,474.27. Consistency requires, we think, that they be eliminated from one place or the other. Since these supplies are specifically listed in the bill of sale of the personal property and since, as we have said, we think other factors indicate that the figure chosen as the price of the crop, $40,525.73, was in excess of the fair market value of the crop on the date of sale, we have found it proper to subtract the cost of these supplies, $16,207.02, *320 from $40,525.73 in order to arrive at the real consideration for the crop. We are satisfied from all the evidence that the resulting figure of $24,318.71 represents the fair market value of the crop on the date of sale. Though we do not regard ourselves as bound by the consideration recited for the depreciable personal property and supplies in the bill of sale, the evidence does not convince us that the fair market value and real consideration of these assets was otherwise than as cited, i.e., $19,474.27, and we have so found. That leaves, of the $90,000 total consideration, the amount of $46,207.02 as the consideration we have found for the land and improvements conveyed. The land consisted of 100 acres of apple trees and 4 acres of buildings. The buildings consisted of 8 two-story dwelling houses, a three-story warehouse and cold storage plant, a packing shed, a spray house, a mess hall, and about 20 employees' cabins. Petitioner, an experienced orchardist and owner of the orchard in question for 4 years, testified that the land was worth in June, 1945, between $550 and $750 an acre. Such testimony from the owner of property is admissible. . *321 Another witness for petitioners, an orchardist and horticulturist in the area for 36 years, and at the time of sale an assistant chief horticulturist with the Regional Agricultural Credit Corporation with duties of appraising orchard properties in this area, testified that the conservative value of the land and buildings was $500 an acre. On the other hand, the price of $30,000 for the land and improvements contended for by respondent and recited in the warranty deed, was fixed by Balmer, who was an attorney and railroad executive from Seattle, and petitioner's attorney, neither of whom was shown to have any expert knowledge of orchard and land values in that area. It was fixed, moreover, out of what was left of the $90,000 after Balmer's unilateral allocation of $40,525.73 to the growing crop. We are satisfied from all the evidence that, of the total of $90,000, a consideration of $46,207.02 represents the fair market value of the land and improvements on the date of sale. As we have found, petitioners transferred depreciable personal property and supplies for a consideration of $19,474.27. In his amended answer respondent apportioned the $19,474.27 between the depreciables and *322 the supplies in proportion, respectively, to the adjusted basis of the depreciables and the cost of the supplies. He treated the amount allocable to the supplies as shortterm capital gain. This action was proper and we have made an identical computation. The supplies were not carried in inventory when originally purchased in 1945 but charged to expense by petitioners. Therefore, they had no basis. Having been purchased in 1945, the holding period could not have exceeded six months on the date of sale, June 26. We have also approved respondent's computation of long-term capital loss on the sale of the depreciables. We have, of course, made a different computation as to the long-term capital gain received on the sale of the land and improvements. Therefore, to that extent we have changed respondent's computation of net capital gain in his amended answer. The final issue herein concerns the correctness of respondent's imposition of negligence penalties against petitioners. We conclude from the evidence that the errors made in petitioners' returns in reporting their gain from the sale of the orchard were not due to negligence or intentional disregard of rules and regulations and we have *323 so found. ; ; ; ; ; affd. (C.A., 9th Cir., 1946), . The action of respondent in asserting 5 per cent negligence penalties is disapproved. Decisions will be entered under Rule 50.